UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re
JOE'S FRIENDLY SERVICE & SON, INC.,
d/b/a THATCHED COTTAGE AT THE BAY,

                                      Chapter 7
                                      Case No. 8-14-70001-reg

                 Debtor.
------------------------------------------------------------x
In re
THATCHED COTTAGE LP,

                                      Chapter 7
                                      Case No. 8-14-70002-reg
                                      (Jointly Administered)

                 Debtor.
------------------------------------------------------------x
BETHPAGE FEDERAL CREDIT UNION and
BUSINESS SERVICES GROUP, LLC,

                 Plaintiffs,

      -against-

                                      Adv. Pro. No.: 8-16-8035-reg

THE TOWN OF HUNTINGTON,
JOSEPH F. CLINE, INDIVIDUALLY,
RICHARD VACCHIO, INDIVIDUALLY, and
TERENCE "TERRY" MCNALLY, INDIVIDUALLY,

                 Defendants.
------------------------------------------------------------x

## DECISION

       This adversary proceeding comes before the Court in the jointly-administered cases of

Joe's Friendly Service & Son, Inc., d/b/a Thatched Cottage at the Bay ("Joe's Friendly") and

Thatched Cottage LP ("Thatched LP") (together, the "Debtors"). The Plaintiffs, Bethpage

Federal Credit Union ("BFCU") and its affiliate Business Services Group, LLC ("BSG")

(together, the "Plaintiffs"), assert due process and other violations arising from the allegedly

improper "placarding" of the Debtors' catering hall by the Town of Huntington (the "Town" or

the "Defendant Town") and certain of its employees (the "Individual Defendants") (together, the "Defendants"). Plaintiffs allege that the improper placarding, which effectively condemned the property, was the culminating event in a scheme to interfere with an impending sale of the Debtors' catering hall and real property to a third-party purchaser by the trustee in this bankruptcy. The Town's role in this alleged scheme was to make the property so unattractive as to make a sale economically unfeasible to a third-party purchaser. The Town allegedly did this by raising issues with prospective purchasers during the sale process, such as requiring a licensing agreement with respect to an alleged encroachment on Town property that had, to this Court's knowledge, not been enforced in decades with prior ownership. The Town also raised structural concerns that had not been raised until the property was on the verge of a sale. Finally, despite the purchaser's agreeing to all the demands and requirements of the Town, the Defendants placarded the property with no notice given to anyone whatsoever. The Town did this within days of receiving engineering reports showing structural infirmities from the Debtors' principal, Ralph Colamussi, with whom the Town is alleged to have schemed. The placard frustrated any possibility that the supposed structural concerns of the Town could be abated.

When the trustee's buyer ultimately walked away from the sale the Plaintiffs, secured creditors, were required pursuant to this Court's sale orders, to purchase the property. Plaintiffs argue that the actions of the Defendants directly affected Plaintiffs because they were unable to sell the property for a period of almost two years, and then only for a price far below the original sale price and at a significant discount from BFCU's lien. Plaintiffs allege that the placarding of the property was done without justification, without following proper procedure, and was done in order to further the objective of the Debtors' principal to prevent a sale to a third party. Although

not raised by the Plaintiffs, the Court notes that it also may have been done in violation of the automatic stay imposed by 11 U.S.C. § 362(a).

Before the Court today is a motion by the Defendants seeking judgment on all counts of the amended complaint. Defendants argue that there are no material facts in dispute here and they are entitled to judgment as a matter of law. One major "factual" premise for the Defendants' motion is that in placarding the Debtors' property they were reacting to an "emergency" situation which justified departure from previously established procedures in order to protect the public from a perceived dangerous situation which threatened the safety of its citizens. The Court finds that this emergency and the alleged danger to the public is far from an undisputed fact. For this reason and other reasons that follow, the Court will deny the Defendants' motion for summary judgment in its entirety.

## FACTS

Prior to the bankruptcy, the Debtor, Thatched LP, owned real property located at 445 East Main Street, Centerport, N.Y. and an adjacent parking lot. Both parcels were encumbered by a mortgage held by Bethpage Federal Credit Union ("BFCU").[1] A catering facility, operated by the Debtor, Joe's Friendly, was located on the property (the "Thatched Cottage"). Ralph Colamussi ("Colamussi") was the principal of both Debtors and had managed the operations of the Thatched Cottage for many years.

In 2011 and 2012, Colamussi claimed the Thatched Cottage sustained damage as a result of Hurricanes Sandy and Irene. Prior to the commencement of the bankruptcy Colamussi contacted the Defendant Town regarding Federal Emergency Management Agency (FEMA) and other possible sources of financial assistance for the Debtors. The Debtors and/or Colamussi

---

[1]      Plaintiff, Business Services Group, LLC ("BSG") is a credit union services organization wholly-owned by BFCU.

retained John Breslin ("Breslin")[2] (attorney) and Neal Hoffman ("Hoffman") (architect) to obtain

the necessary permits for renovations, repairs or improvements of the Thatched Cottage.

Although at this time Colamussi was informed that there were improvements at the Thatched

Cottage which encroached onto the Town's property, DiConza Decl. Suppl. Summ. J.,

("DiConza Decl."), Ex. 23, ECF No. 70-18,[3] the encroachments and whatever damage may have

been done by the hurricanes were not severe enough to interfere with or impede the continued

operation of the Thatched Cottage.

On January 2, 2014 the Debtors filed separate bankruptcy petitions under chapter 11 of

the Bankruptcy Code, and the Court authorized the joint administration of the Debtors' cases.

The Thatched Cottage continued operations during the bankruptcy under the management of

Colamussi until April, 2014, when the Court, at the request of the Debtors, approved the

retention of Hospitality Credit, LLC ("Hospitality Credit") to manage the catering facility. Gino

Scotto ("Scotto") manages Hospitality Credit.[4] The original arrangement between Colamussi and

Scotto was that Scotto would infuse approximately $200,000 of debtor-in-possession financing

in exchange for a 51% interest in a reorganized entity in which Colamussi would own 49%.

Disclosure Statement, dated April 2, 2014, at 21, Case No. 14-70001, ECF No. 114. It was

Colamussi's goal to emerge from chapter 11 in partnership with Scotto.[5]

The Thatched Cottage continued operations as a debtor-in-possession, providing a

wedding venue and accepting deposits for future events under the management of Hospitality

---

[2]      Breslin is a real estate attorney working predominantly within the Town and with expertise in zoning issues.

[3]      Unless otherwise noted, "ECF" references are references to docket entries in the adversary proceeding, 16-8035.

[4]      The Scotto family are well-known restauranteurs in the New York area.

[5]      https://www.newsday.com/long-island/towns/thatched-cottage-links-with-owner-of-westbury-manor-1.7321647

Credit. From the time of the hurricanes and continuing post-petition this very prominent iconic facility operated very publicly and with no restrictions placed on it by the Town. There is no evidence that at any time during the years that Colamussi and later Scotto operated the Thatched Cottage anyone concluded that the structure was so unsafe that it represented a danger to the safety of its patrons. There is also nothing in the record that demonstrates the Town at any time during the years Colamussi operated the facility had serious safety concerns about the facility. In fact, on June 3, 2014, the Defendant Town, in its ordinary course, inspected the Thatched Cottage and issued an occupancy and assembly permit dated August 18, 2014. McCord Decl. in Opp'n to Defs. Mot. for Summ. J., ("McCord Decl."), Ex. 49, ECF No. 79-14. This permit was signed by both Terence McNally, Chief Fire Marshall for the Town ("McNally" or "Defendant McNally") and Joseph F. Cline, Director of the Department of Engineering Services for the Town ("Cline" or "Defendant Cline").

 At some point, Colamussi's mental health and his fitness to operate Thatched Cottage as a debtor-in-possession was called into question,[6] and at a hearing on July 3, 2014, the Court found that a chapter 11 trustee should be appointed. By notice dated July 4, 2014, R. Kenneth Barnard was appointed chapter 11 trustee (the "Chapter 11 Trustee"). On July 24, 2014, the Chapter 11 Trustee moved to sell the Debtors' property under § 363(b), which motion was granted and the auction was scheduled for September 24, 2014. The terms and conditions of sale included that the Thatched Cottage was to be sold "as is" "where is" and "without all faults".

 Now faced with the imminent sale of the Thatched Cottage to a third party, Colamussi embarked on a scheme designed to impede the efforts of the Chapter 11 Trustee to sell the

---

[6]      Allegations that Colamussi had threatened to burn down the Thatched Cottage arose in mid-June or early-July of 2014, which supposedly resulted in Colamussi's commitment to a psychiatric facility. Barnard Dep. Tr., 36, ECF No. 78-18.

property for the benefit of the creditors. On August 27, 2014, Colamussi sent an email to the

Chapter 11 Trustee containing engineering reports that indicated unsafe conditions and costly

repairs associated with the Thatched Cottage. DiConza Decl. Ex. 16. Colamussi also spoke to the

auctioneer before the sale to discuss the damage to the Thatched Cottage. Colamussi Dep. Tr.

119, ECF No. 78-4, Ex. 2. A day prior to the auction, Colamussi attempted suicide. Defendant

McNally was aware of this attempted suicide because, in his capacity as Chief Fire Marshall, he

was called to the scene. McNally Dep. Tr. 56-57, ECF No. 78-30.

   The auction proceeded on September 24, 2014 and Yama Raj ("Raj") was the highest

bidder at $4,650,000 plus a buyer's premium of $186,000, for a total sales price of $4,836,000.

BFCU credit bid in the amount of $4,600,000, and was deemed the second-highest bidder.

Pursuant to this Court's orders approving the bidding procedures and then approving the ultimate

sale, BFCU became the back-up bid bound by the terms of sale and was legally required to close

in the event of Raj's default. *See* Orders, dated August 11, 2014 and October 16, 2014, Case No.

14-70001, ECF Nos. 210 and 247. The sale was originally scheduled to close on November 15,

2014. The Thatched Cottage ceased operations on October 6, 2014.

   Despite the fact that the Thatched Cottage had operated for many years at the same

location the Town apparently decided to resurrect, around the time the sale to Raj was approved,

its objection to the encroachment by a portion of an improvement of the Thatched Cottage onto

land owned by the Town. This fact was communicated to Raj after he retained Breslin and

Hoffman to work with the Town to help reopen the Thatched Cottage. Representing Raj,

Hoffman emailed Steven Haber ("Haber"), an employee of the Town's Planning Department, on

October 8, 2014, inquiring as to whether the "minor renovations" Raj wanted to do would

require "a whole site plan application." DiConza Decl. Ex. 24. Haber reminded Hoffman that

"there is [sic] a multitude of violations on the property, not to mention encroachments" that would need to be resolved "before any other permits can be issued." *Id.* Haber scheduled a meeting between Raj and the Town for October 16, 2014.

After the October 16th meeting, Haber emailed his colleague in the Town Supervisor's Office, Betty Walsh ("Walsh"), and told Walsh he had met with "the new owners" of the Thatched Cottage. The email indicates that Haber instructed Raj to speak with the Deputy Town Supervisor, Patricia Del Col ("Del Col"). DiConza Decl. Ex. 26, ECF No. 70-18. Walsh then scheduled a meeting between employees of the Town, including Del Col, and Raj for October 28, 2014. The day before the meeting, Walsh emailed Hoffman a memorandum with a list of items to be addressed at the meeting. McCord Decl. Ex. 52, ECF No. 79-17. The memorandum raised no questions regarding structural or safety concerns, but Hoffman responded to Walsh that the list of items was lengthy, and he informed her that keeping the Thatched Cottage closed for an extended period of time would be economically infeasible for Raj. McCord Decl. Ex. 40, ECF No. 79-5. It appears that Walsh then forwarded Hoffman's response to Defendant Cline, Del Col, Haber, and the deputy Town attorney, Thomas Glascock ("Glascock"), among others. *Id. See also* McCord Decl. Ex. 41, ECF No. 79-6. Haber replied to Walsh stating, "[w]e will need to talk about guarantees $$$$$ and long term goals." *Id.*

On October 24, 2014, a letter was delivered to the Town Supervisor's Office by an entity called the Concerned Citizens of Centerport (the "First Concerned Citizens Letter"). McCord Decl. Ex. 64, ECF No. 79-29. The First Concerned Citizens Letter stated that the author or author(s) had "many meetings in Town Hall with various Department Heads" regarding safety issues at the Thatched Cottage. A second letter from the Concerned Citizens of Centerport, dated November 7, 2014 (the "Second Concerned Citizens Letter"), was received by the Town on

7

November 13, 2014. McCord Decl. Ex. 65, ECF No. 79-30. This letter was sent to the Town's

Engineering Services Department and it included a local news article questioning the structural

integrity of the Thatched Cottage (the First Concerned Citizens Letter and the Second Concerned

Citizens Letter together referred to as "the Concerned Citizens Letters"). Defendant Cline

testified that "nothing was done" to investigate the claims raised in the Concerned Citizens

Letters or who they were from. Cline Dep. Tr., 37, Feb. 4, 2016, ECF Nos. 70-22, 70-23. The

author(s) of the Concerned Citizens Letters remain anonymous.

On November 13, 2014, Colamussi hand-delivered a package to the Fire Marshal's

Office for the Town of Huntington. The package included engineering reports apparently

showing that the Thatched Cottage was unsafe (the "Colamussi Reports"). While there,

Colamussi spoke with Defendant McNally. McNally testified that he did not accept the package

from Colamussi, and left it on the counter. McNally Dep. Tr., 46-47, June 9, 2017, ECF Nos. 78-

30, 78-31, 78-32. Defendant Cline testified that he overheard the conversation between

Colamussi and McNally, and decided to take the package after Colamussi left. Cline Dep. Tr.,

44-46, June 1, 2017, ECF Nos. 70-3, 70-4.

On November 14, 2014, Raj became aware of the Colamussi Reports and the Concerned

Citizens Letters. DiConza Decl. Ex. 36, ECF No. 70-29. After discussions with Cline, Hoffman

informed Raj that in order to open the Thatched Cottage, Raj would have to retain an engineer.

*Id*. At some point on November 17, 2014, Breslin advised Raj that according to Defendant Cline

the Thatched Cottage would not be permitted to reopen until an engineering report proved the

Thatched Cottage was safe (the "Breslin Letter"). Pls.' Suppl. Aff. in Opp'n to Defs. Mot. for

Summ. J. ("Pls.' Suppl. Aff."), Ex. 94, ECF No. 103-17. It is clear that Hoffman and Breslin

understood that the Town and/or Defendant Cline had decided to keep the Thatched Cottage

closed.

The record indicates that the Colamussi Reports were circulated throughout the Town

Supervisor's Office on November 14, 2014. McCord Decl. Ex. 43, ECF No. 79-8. In an email

dated November 17, 2014, Haber asks Walsh if she knew whether Cline was aware of the

Colamussi Reports. McCord Decl. Ex. 44, ECF No. 79-9. Walsh responds that she had just

gotten off the phone with Cline and that "[t]he building is to be placarded." *Id.* At that time, she

raised the question of whether Raj would continue to pursue reopening the Thatched Cottage, or

if he would "walk away." *Id*. It seems clear that Walsh understood that the placarding of the

property could impact Raj's decision to close on the sale.

Despite Walsh's email suggesting that the decision to placard the Thatched Cottage had

been made by November 17, 2014, and the above correspondence to Raj from Hoffman and

Breslin indicating that the Thatched Cottage was to remain closed, Cline testified that the

decision to placard was not made until November 18, 2014. Cline Dep. Tr., 54, 77, June 1, 2017,

ECF Nos. 70-3, 70-4. Cline testified that generally his role in the placarding process is limited to

"instances when [his] staff bring[s] specifics" for a discussion prior to placarding, *Id.* at 15, and

that he is not typically involved in placarding. *Id*. at 50. Cline further testified that the decision

was made after conversations with Defendant McNally and Richard Vacchio (Senior Building

Inspector for the Town) ("Vacchio" or "Defendant Vacchio") regarding the Colamussi Reports

between November 14, 2014 and November 18, 2014.[7] Cline called Del Col on November 18,

---

[7]     The Defendants' position is that the decision to placard was that of Defendant Cline alone.
However, Cline's own testimony contradicts such an assertion. At one point, Cline testified that Vacchio,
McNally and he decided to placard. Cline Dep. Tr., 15, June 1, 2017, ECF Nos. 70-3, 70-4. Later, Cline
testified that he made the determination to placard, but did so in consultation with Vacchio and McNally.
*Id.* at 52.

2014, to let her know that the decision to placard had been made, even though doing so was "not in the course of normal business." *Id*. at 50. Cline testified that he called Del Col because the Colamussi Reports indicated a "risk to the public," and "the placard changed things" between the Town and Raj regarding opening the Thatched Cottage for business. *Id.* at 15. The recognition by the Town that placarding this property, which was apparently based on the Colamussi Reports, may have had an impact on Raj's ability to timely reopen the facility is an important element to this case.

In the meantime, the Deputy Town Attorney, Glascock, had begun drafting a licensing agreement that would permit Raj to use the encroachment. Breslin, representing Raj, and Glascock were in frequent communication regarding the licensing agreement despite indications from Cline that the Town would not permit the Thatched Cottage to reopen until an engineering report proved the premises to be safe. *See* the Breslin Letter. An email exchange between Glascock and Breslin indicates that there were no substantial issues regarding the licensing agreement until November 18, 2014. DiConza Decl. Ex. 40. On November 18, 2014, Glascock emailed Breslin's office regarding the licensing agreement, cc'ing Cline, Walsh, and Del Col, stating that "all structural deficiencies must be addressed before" the licensing agreement could be reached. Breslin replied that Raj had an engineer look at the Thatched Cottage and that Raj was "prepared to make whatever repairs are needed to satisfy the [T]own." DiConza Decl. Ex. 41. Glascock then agrees that language regarding the repairs would be added as a condition to the licensing agreement. *Id*.

The email from Breslin to Glascock stating that Raj was willing to make repairs is forwarded to Walsh minutes later. McCord Decl. Ex. 47, ECF No. 79-12. Walsh then forwards

the email chain to Del Col, and asks "what does Ralph want?"[8] *Id.* Walsh testified that she could

not remember this email or what prompted her to write it. Walsh Dep. Tr., 103, ECF Nos. 78-33,

78-34, 78-35. Del Col responds, "said we should be doing something about Thatched Cottage"

and that Del Col instructed her secretary "to tell him we were taking care of it." McCord Decl.

Ex. 47, ECF No. 79-12. Del Col testified that she does not recall this email to Walsh, and

therefore could not testify to whom she was referring, or what "taking care of it" meant. Del Col

Dep. Tr., 61-65, June 12, 2017, ECF Nos. 78-36, 78-37, 78-38. Walsh testified, mainly, that she

could not remember much of anything regarding her correspondence and conversations

regarding the Thatched Cottage. The memory lapses of Town employees when dealing with

these critical facts causes the Court concern.

On November 20, 2014, Defendant Vacchio placarded the Thatched Cottage at the

direction of Defendant Cline. The placard includes a telephone number for the Town of

Huntington, states that the property is "unfit for human habitation pursuant to the Code of the

Town of Huntington", and advises that occupancy of the building is unlawful and subject to

$15,000 fine and/or six months imprisonment. McCord Decl. Ex. 54, ECF No. 79-19. It does not

assert a section of the Town Code, or any other reason for placarding. Although discussions

about the condition of the building were taking place between the Town and Raj, and despite a

nearly one week lapse between receiving the Colamussi Reports and the placarding, at no time

prior to placarding did the Town send verbal or written notice to the Debtors or the Chapter 11

Trustee that the building was unfit for occupancy or request that repairs be made. Nor did the

Town at any time seek relief from this Court pursuant to 11 U.S.C. § 362(d) or (b)(4). The Town,

apparently without regard to its own procedures and with no consultation with the Chapter 11

---

[8]    Walsh's testimony supports the conclusion that "Ralph" is in fact Colamussi. Walsh Dep. Tr., 52,
ECF Nos. 78-33, 78-34, 78-35.

Trustee and in total disregard for the fact the property was under the control of this Court as set forth in the Bankruptcy Code, proceeded to exercise its own version of self-help.

Shortly after the placarding, Raj refused to close on the purchase of the Thatched Cottage. Raj initially stated that he refused to close "because the property was not a waterfront facility" as a result of the encroachment, an issue that apparently did not concern the Town until the property was to be sold. Raj "was unaware of the total uselessness of the building" prior to the placarding. Case No.14-70001, ECF No. 273, Ex. 1, ¶¶ 4, 14. As a result of Raj's default, Plaintiff BSG, as back up bidder was required to take title to the Thatched Cottage and did so on January 2, 2015. It appears that Colamussi's plan to interfere with the sale, aided wittingly or unwittingly by the Town, had succeeded.

This chapter 11 case was converted to chapter 7 on June 24, 2015, and R. Kenneth Barnard was appointed chapter 7 trustee.

Between January 2015 and April 2016, the Town and the Plaintiffs were in regular communication. Email records indicate that the Town permitted the Plaintiffs to show the Thatched Cottage to potential buyers on a few occasions. In Fall of 2015, the Plaintiffs were in contract to sell the Thatched Cottage to an entity called the Matrix Group (herein "Matrix"),[9] DiConza Decl. Ex. 50, however that sale did not go through as a result of the death of the principal. DiConza Decl. Ex. 58.

On March 10, 2016, the Defendants' lawyer emailed the Plaintiffs' lawyer, stating that "until the structural defects are addressed by … a [p]rofessional [e]ngineer or [a]rchitect saying

---

[9]      Breslin also represented Matrix in its discussions with the Town regarding the Thatched Cottage. Del Col Dep. Tr., 53, ECF No. 78-37. After attending a meeting with the Town on behalf of Matrix, Breslin emailed Del Col thanking her for the meeting and stating he "think[s] it will be good for all I am trying to get them to influence the bank to drop the lawsuit." DiConza Decl. Ex. 57, June 12, 2017, ECF No. 70-39. Breslin testified he had "discussions" with Matrix about influencing Plaintiff BFCU to drop this lawsuit. Breslin Dep. Tr., 204-06, March 2, 2018, ECF No. 103-12.

[the Thatched Cottage] is safe in writing, or … [p]ermit plans submitted to [the Town] … [n]o one should be inside the building." DiConza Decl. Ex. 59, ECF No. 70-39. The Plaintiffs commissioned an engineering report (the "Pacifico Report") that was submitted to the Town on April 15, 2016. *Id*.; *see also* DiConza Decl. Ex. 60, ECF No. 70-39. The Town removed the placard on April 19, 2016. DiConza Decl. Ex. 61, ECF No., 70-39. Shortly thereafter, the Plaintiffs entered into a contract to sell the Thatched Cottage, and that contract was closed in September of 2016 for $2,800,000. McCord Decl. Ex. 67.

*Procedural history*

In February, 2016, the Plaintiffs commenced this action against the Town and individual employees of the Town in state court. The Defendants removed the action to this Court on March 14, 2016, asserting that the instant action is "related to" the Debtors' bankruptcy proceeding pursuant to 28 U.S.C. § 1334. An amended complaint was filed on August 12, 2016, and by motion, dated October 19, 2016, the Defendants moved to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). That motion was denied by Order, dated December 12, 2016. In January, 2017, the Defendants moved to withdraw the reference to the District Court. That motion is still pending at the District Court.

The instant motion for summary judgment was filed by the Defendants on July 31, 2017, and the matter was initially taken under submission on November 28, 2017. Based on "new evidence", discussed below, discovery was re-opened. Supplemental briefs were filed on April 13, 2018 at which time this matter was taken under submission.

*"New evidence" - The Tauscher Reports*

On January 12, 2018, counsel for Plaintiffs informed the Court that it had recently become aware of information relevant to this matter. Pls.' Letter to the Ct., ECF No. 88.

Apparently, in the days between November 17 and November 20, 2014, Raj commissioned and acquired two documents from Tauscher Cronacher Professional Engineers (herein, "Tauscher"). This evidence did not come to the Plaintiffs' attention until December 2017 or January 2018, in connection with a deposition of Breslin in a separate but related action against the title insurer. *Id.*

The record as supplemented, including two depositions by Tauscher personnel, indicates that Raj personally commissioned an engineering report from Tauscher on November 17, 2014. Koller Dep. Tr., 24, ECF No. 101-5. The records kept by Tauscher reflect that Raj intended Tauscher to inspect specific concerns, including "roof structural, settling, water damage[,] everything but the mechanicals." McCord Suppl. Decl. Ex. 82, ECF No. 103-5. On November 18, 2014, Anthony Grieco ("Grieco"), an independent contractor working on behalf of Tauscher, inspected the Thatched Cottage. Grieco Dep. Tr., 27, ECF No. 103-4. Grieco's notes and testimony reflect that he drafted an initial report (the "Short Tauscher Report"), and Raj received that report on November 19, 2014. Grieco Dep. Tr., 39. The Short Tauscher Report apparently focused solely on damage resulting from Hurricane Sandy. Grieco Dep. Tr., 28-29. The Short Tauscher Report lists four observations regarding the structural integrity of the Thatched Cottage which lead Grieco to write "there are no indications of structural movement or instability caused by … [Hurricane] Sandy or other storms." McCord Suppl. Decl. Ex. 93. The Short Tauscher Report noted that "the leakage condition caused by the roofing and other problems need to be fully investigated." It does not state that the building is unsafe or unfit for human habitation. *Id*.

Grieco's notes and testimony indicate that he drafted a final report (the "Long Tauscher Report") (together with the Short Tauscher Report, the "Tauscher Reports"), and that Raj

received that report on November 20, 2014, presumably after the building was placarded.[10]
Grieco Dep. Tr., 38-40; *see also* McCord Suppl. Decl. Ex. 82.

Based upon this new evidence, and upon the request of the Plaintiffs, the Court re-opened discovery for the limited purpose of discovering if and when the Defendants learned of the Tauscher Report(s). According to the Plaintiffs, the Tauscher Report(s) negate the findings of the Colamussi Reports. Pls.' Suppl. Mem. of Law, 2-4, ECF No. 105. The Plaintiffs assert that the Defendants received and considered one or both of the Tauscher Reports prior to November 20, 2014, disregarded Grieco's findings, and chose to placard anyway.[11]

### The Huntington Town Code

The Plaintiffs' due process arguments rest largely on allegations that the Town and its employees failed to follow proper procedures in placarding the Thatched Cottage. As such, the Court will review the relevant statutes.

The Town Code of Huntington provides that in certain circumstances "any structure … may be condemned if, in the opinion of the code officer, it is unfit for human habitation or occupancy, and may be placarded." HUNTINGTON, N.Y., CODE, ch. 124 (the "Town Code") § 124-55 (2011); *see also* McCord Decl. Ex. 73, ECF No. 79-38. The Town Code lists a number of conditions that would warrant such a placard, including, if the structure is unlawful, the structure creates a hazard to the health and safety of the occupants because of lack of maintenance, poor

---

[10]     The Long Tauscher Report concluded that the Thatched Cottage is "in less than acceptable condition" and that it requires "considerably more renovation, rehabilitation and maintenance than most we [Tauscher] examine." DiConza Suppl. Decl. Ex. 5, ECF No. 101-5.

[11]     The Plaintiffs offer two reasons for this assertion that Raj must have given the Town a copy of the Tauscher Reports. First, the only reason Raj commissioned Tauscher was to show the Town that the Thatched Cottage was in fact safe, and therefore could be reopened for business. Second, a note drafted by Grieco on scrap paper, dated November 20, 2014, states that Raj picked up the Long Tauscher Report in "late afternoon" and had "advised" the Tauscher Group that the Town "disagrees and wants a second report." Grieco testified that he believed at the time that Raj had shown the Short Tauscher Report to the Town and that they had disagreed with the findings. Grieco Dep. Tr., 46.

ventilation, damage or decay. *Id*. § 124-55(A)-(F). A code officer may also placard a structure if there is "any other condition which, in the opinion of the code officer, is dangerous or jeopardizes the health, welfare and safety of the general public or occupants." *Id.* § 124-55(G).

In making a determination that a structure is unfit for human habitation or occupancy, the code officer, "or any consultant retained by the town may inspect" the premises that the code officers believes "in his or her judgment, is or may become dangerous or unsafe." Town Code § 124-56. The Town Code further requires that "written notice shall be served by the code officer upon the property owner … or any person having a vested or contingent interest in the property as shown on the current assessment roll of the Town … directing the removal, remediation or abatement of the unsafe … condition." *Id.* § 124-57(A). The Town Code requires the notice to contain a description of the property, a description of the unsafe condition, a description of the remedial action necessary for compliance, and a statement that, in the event of failure to bring the property in compliance with the Town Code, a fact-finding hearing will be held, among other things. Town Code § 124-57(B). The Town Code states "the notice shall be served either personally in accordance with the CPLR or by registered or certified mail … addressed to the property owner … or person having a vested or contingent interest in the property." *Id.* § 124-57(C).

The Town Code states that "an administrative hearing may be held by the Huntington Town Board or a duly appointed Administrative Hearing Officer, at the option of the Town." *Id.* § 124-59. If the hearing is before the Town Board, the Town Board "may consider the report and accept or reject, in whole or in part, the findings and recommendations of the code officer." *Id*. § 124-59(A). Further, if the Town Board concludes that the structure is unfit for human habitation, the "Town Board may condemn the structure … until the hazardous or unsafe condition is

rectified as directed, and upon the failure, neglect or refusal of such person(s) to comply, the Board may authorize the code officer to re-placard." *Id.*

If the hearing is conducted by an Administrative Hearing Officer, rather than the Town Board, "the Hearing Officer may consider the evidence and submit his or her findings and recommendations to the Code Officer for ultimate determination." *Id.* § 124-59(B). Then, "the Director shall consider the written objections and the Hearing Officer's report, and may adopt or reject, in whole or in party any portion thereof." *Id.* "Upon a finding that the building … is or may become dangerous or unsafe for human habitation or occupancy … the Code Officer may condemn the structure and direct the owner … or any person having a vested or contingent interest in the property to vacate … until the hazardous or unsafe condition is rectified as directed, and upon the failure … to comply, the Code Officer may authorize the building re-placarded." *Id.* In such a circumstance, the "Code Officer's determination shall be final, and shall be filed in the Office of the Huntington Town Clerk and mailed to the person(s) to whom the original notice was served." *Id.*

The Town Code prescribes special rules regarding unsafe structures if an emergency condition exists. The Town Code states that an emergency exists "in the judgment of the code officer … when there is imminent danger of failure or collapse … or when there is actual or potential danger to the occupants of or to those in proximity of any structure .. because of the existence of explosive fumes or vapors, or the presence of toxic fumes, gases or materials … or other imminent danger." Town Code § 124-61. In such an emergency situation the Code Officer "may issue a verbal or written order … to remedy the dangerous … condition … within forty-eight (48) hours of service of the notice." *Id.* If the condition constituting an emergency is not remedied, "the officer shall report his findings and recommendations to the Town Supervisor

17

who, upon such findings, may execute a declaration of emergency authorizing town personnel to placard the property." *Id*. The Town Code has the same rules for dilapidated or damaged buildings as it does for buildings that are unsafe for human habitation. Town Code, ch. 191. A building is dilapidated or damaged, if the code officer "upon inspection" finds circumstances such as a leaning or bulging wall, damage to the overall structure, improperly distributed loads, and more. *Id.* § 191-04.

The Defendants have asserted that the Town "was permitted to placard property that it considered 'unsafe' or 'unfit for human occupancy' 'whenever such structure is unsafe …'", Defs.' Mem. of Law in Suppl. of Mot. for Summ. J., 30, ECF No. 68, and they cite the New York State Uniform Fire Prevention and Building Code (the "Uniform Code") as authority. Defendants argue that under the Uniform Code, "a placard could have been posted even if the [Colamussi] Reports did not call into question the structural integrity of the Thatched Cottage." *Id.* at 3 n. 3.

The Defendants' reliance on the Uniform Code is misplaced. The Uniform Code "prescribes minimum standards for both fire prevention and building construction. It is applicable in every municipality of the State" of New York. N.Y. Dep't of State, Legal Memorandum LG03, *NYS Uniform Fire Prevention and Building Code: What Elected Officials Need to Know*, https://www.dos.ny.gov/cnsl/lg03.htm. However, the Uniform Code "permits a municipality to 'opt out' of its administration and enforcement responsibilities by adopting a local law" or enacting a "local law or ordinance imposing standards for construction in the municipality that are 'higher or more restrictive' than the corresponding standards in the Uniform Code." *Id*. It is indisputable that the Town had enacted the Town Code at the time of the placarding, and that the placard specifically stated that the Thatched Cottage was deemed unsafe

for human habitation pursuant to the Town Code. Defendant Cline invoked the Uniform Code

for the first time in an internal memo to Councilman Mark Cuthbertson ("Councilman

Cuthbertson") dated December 3, 2014 (the "Cuthbertson Memo"), when Councilman

Cuthbertson requested "a summary of events leading up to the placarding of the Thatched

Cottage. Cline Dep. Tr., 83, February 4, 2016, ECF Nos. 70-22, 70-23. The enactment of the

Town Code precludes reliance on the Uniform Code, and the Court will not countenance the

Defendants efforts to revert to the less restrictive minimum requirements of the Uniform Code to

serve their immediate purposes. For these reasons, the Court finds that the process here should be

measured under the Town Code at least for purposes of this Decision.

## DISCUSSION

The amended complaint alleges both constitutional violations pursuant to 42 U.S.C. §

1983 and state-law based tort and negligence claims. The Defendants move for summary

judgment as to all claims, and assert both qualified immunity and absolute immunity defenses as

to the Individual Defendants, Cline, Vacchio and McNally. The Defendants also raise an issue of

standing. The Plaintiffs object. Although neither Plaintiffs nor Defendants have addressed the

possibility that the Defendants violated the automatic stay when they placarded the Thatched

Cottage, the Court believes it prudent to do so at the outset of this discussion.

### I.    *The Automatic Stay*

The filing of a bankruptcy petition operates as an automatic stay of a wide range of

actions against a debtor and/or the debtor's property. 11 U.S.C. § 362(a). The stay is "applicable

to all entities," *Id.*, and it is "intended to protect the debtor and property of the estate." *In re*

*Ampal-American Israel Corp.*, 502 B.R. 361, 369 (Bankr. S.D.N.Y. 2013) (citing H.R. REP. NO.

95-595, at 340 (1977)) (noting that the automatic stay also provides creditor protection and

prevents a race to the courthouse). The automatic stay affords protections to debtors, parties in interest, and creditors. Actions to enforce the stay can be maintained by secured creditors and principals of the debtor in addition to bankruptcy trustees and the debtors themselves. *See In re Killmer*, 513 B.R. 41 (Bankr. S.D.N.Y. 2014) (holding, upon motion by secured creditor, county's tax sale of debtor's real property *void ab initio* four years later); *see also In re Congregation Birchos Yosef*, 535 B.R. 629, 635 n. 5 (Bankr. S.D.N.Y. 2015) (noting that the injured principals of debtor in that case were individuals for purposes of § 362(k), but "[w]here violation of the automatic stay injures corporate or other juridical persons, damages are awarded under the Court's general contempt power…or under 11 U.S.C. § 105(a)").

The Bankruptcy Code provides exceptions to the automatic stay in § 362(b). Relevant here, § 362(b)(4) permits the "commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power. . ." 11 U.S.C. § 362(b)(4). Congress intended this exception to be narrowly construed. *In re PMI-DVW Real Estate Holdings, L.L.P.*, 240 B.R. 24, 31 (Bankr. D. Ariz. 1999) (citing H.R.REP NO. 595, 95th Cong., 1st Sess. 342). "The party asserting an exception to the automatic stay bears the burden of proving that the exception applies." *In re Best Payphones, Inc.*, Case No. 01-15472 (SMB), 2016 WL 164900, at * 11 (Bankr. S.D.N.Y. Jan. 13, 2016).

Although the statute does not require the governmental unit to seek a determination under § 362(b)(4) in advance of exercising their authority, any party taking action against a debtor or its property does so at its peril. *See Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d 374, 385 (6th Cir. 2001) (finding that although governmental unit need not first seek relief from the bankruptcy court there is a risk that the court will later find its action outside the (b)(4) exception and declare the action void *ab initio*). If the action is challenged as a violation of the automatic stay, "[t]he

20

Court has a duty to scrutinize the governmental unit's claims that it is acting under its police and regulatory power and to determine a valid exception to the automatic stay exists, rather than simply assuming the police and regulatory power is involved because the governmental unit has made an appearance." *PMI-DVW Real Estate Holdings*, 240 B.R. at 31 (citing *Corporacion de Servicios Medicos Hospitalarios de Fajardo v. Mora*, 60 B.R. 920 (D.P.R. 1986)) (finding that condemnation proceeding was not within the governmental police and regulatory exception to the stay, and noting that even if it was, the court could have imposed a separate stay under 11 U.S.C. § 105 to protect the property of the estate); *Cf. In re Royal*, 137 Fed.Appx. 537 (4th Cir. 2005) (finding that county's proposed eminent domain taking of property of the estate did not fall within the § 362(b)(4) exception). If the stayed party is incorrect in their belief that the stay does not apply, they may be held liable for violating the automatic stay. *See In re E. Refractories Co. v. Forty Eight Insulations Inc*., 157 F.3d 169, 172-73 (2d Cir. 1998); *48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc.*, 835 F.2d 427, 431 (2d Cir. 1987).

The Court makes no findings today as to whether the Town violated the automatic stay when it placarded the Thatched Cottage. However, it is inconceivable to the Court that the Town was not aware of the Debtors' bankruptcy filings, which were widely publicized in local newspapers and had been for almost one year at the time of placarding. It appears to the Court that the Town and its employees' actions were taken in utter disregard for the fact that the Debtors and the property were under the protection of the Court and federal bankruptcy laws. If the Town gave any thought to this fact, which the Court believes it did not, the better course of conduct would have been to seek relief from the automatic stay and/or seek a determination that its actions were protected by the police and regulatory power exception to the stay. The Town's argument that they had to act quickly to address an "emergency" situation is not borne out by the

facts of this case, as discussed later in this Decision. And so, it is with this background that the

Court will now address the Defendants' motion for summary judgment and the Plaintiffs'

objections.

## II.    Standing

As a threshold matter, Defendants have challenged Plaintiffs' standing to bring these

claims. To establish standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is

(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2)

the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as

opposed to merely speculative, that the injury will be redressed by a favorable decision." *Mhany*

*Management, Inc. v. County of Nassau et al*, 819 F.3d 581, 600 (2d Cir. 2016).

The Defendants argue that the Plaintiffs do not have standing to assert claims arising

from the placarding because at the time of the placarding the Plaintiffs did not have title to the

Thatched Cottage and thus they could not have been damaged by the placarding. They also argue

that any harm to the Plaintiffs resulted from Raj's refusal to close on the purchase of the

Thatched Cottage, and not the act of placarding by the Defendants. We take each of the

Defendants' arguments in turn.

First, the Court cannot find a matter of law that BFCU did not suffer an injury as a result

of Raj's failure to close at the $4.8 million purchase price, when the ultimate purchase price fell

by $2 million after the property was placarded causing BFCU to be further undersecured.

Defendants' arguments to the contrary do not take into account that the Plaintiff, BFCU, had a

legally recognized interest in the property as a secured creditor prior to taking title to the

property in January 2015. *See discussion, infra*. Thus the fact that Plaintiff, BSG, took title only

in January 2015, after the placarding, does not negate Plaintiffs' injuries. This conclusion is

supported by the decision in *Cunney v. Board of Trustees of the Village of Grand View*, 56 F.

Supp. 3d 470 (S.D.N.Y. 2014). In *Cunney* the district court found that a plaintiff had established

the requisite standing to assert § 1983 claims against the defendant village for constitutional

violations despite the fact that the plaintiff did not own the property at the time the violation

occurred. *Cunney*, 56 F. Supp. 3d at 490. There the court ruled that the plaintiff satisfied the

injury in fact burden because the plaintiff established he had "personally suffered various forms

of financial loss, including but not limited to permanent loss in value … lost interest on profit,

and temporary loss of use … carrying costs … and attorney and professional fees." *Id*. The Court

finds that the Plaintiffs have shown that they suffered an economic injury that is judicially

cognizable despite the fact that they did not hold title to the property on the date it was

placarded. *See generally Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 550 (S.D.N.Y.

2014) ("[T]he injury-in-fact inquiry focuses on whether the alleged injury is 'judicially

cognizable"… not whether plaintiff can satisfy the injury element of a particular cause of

action").

Next, the Defendants argue that any injury to the Plaintiffs was caused solely by Raj, and

is not "fairly traceable" to the Defendants' actions. The Court disagrees. A plaintiff does not lack

standing merely because her injury is an indirect result of the defendant's conduct. *See Garelick

v. Sullivan*, 987 F.2d 913, 919 (2d Cir. 1993). The record of this case shows that: BFCU held a

legally recognized interest in the real property both before BSG took title, i.e., as a secured

creditor, and after; the Town placarded the property on November 20, 2014 without following

procedures set forth in the Town Code; shortly thereafter the successful bidder at auction, Raj,

refused to close on the property at the $4.8 million sale price because the inability to continue the

operations of Thatched Cottage made the purchase economically infeasible; as a result of Raj's

failure to close Plaintiff, BSG, was required under this Court's sale orders, dated August 11, 2014 and October 16, 2014, to take title to the property in January 2015; and Plaintiffs incurred carrying costs on the property until September 2016 when it was ultimately sold for $2.8 million. The Court finds that these facts and the other facts developed by the record in this case are sufficient to establish that the Plaintiffs' alleged injury is fairly traceable to the Defendants' conduct. Therefore, the Court finds that Plaintiffs have standing to assert these claims.

### III.    Summary Judgment

Under Federal Rule of Civil Procedure 56(c), "a court may not grant a motion for summary judgment unless the pleadings, depositions, answers to interrogatories, and admission on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Messer v. Board of Educ. of City of New York*, No. 01-CV-6129 (JFB)(CLP), 2007 WL 136027 (E.D.N.Y. Jan. 16, 2007) (quotations omitted) (citing *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir. 2006)). The Court must view the evidence in a light most favorable to the party opposing summary judgment, draw all reasonable inferences in favor of that party, and eschew credibility assessments. *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d. Cir. 2004). Further, summary judgment is unwarranted if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986). After the defendant has met its burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d. Cir. 2002).

"The Court of Appeals for this Circuit has repeatedly held that disputed questions regarding the parties' intentions should not be adjudicated on a motion for summary judgment

based on affidavits and depositions but rather should await trial." *Savarin Corp. v. National Bank of Pakistan*, 290 F. Supp. 285, 289 (S.D.N.Y. 1968) (citing *Preston v. United States Trust Co.*, 394, F.2d 456 (2d Cir. 1968); *Union Insurance Society of Canton, Limited v. William Gluckin & Co.*, 353 F.2d 946 (2d Cir. 1965)). Where facts are undisputed "but the inferences to be drawn therefrom are [disputed and] important and at issue, summary judgment is inappropriate." *Id.* (denying summary judgment where the record was "lengthy, often contradictory, and incomplete" and included "numerous documents which attempt to throw light on the ultimate issue, but which have, in fact, tended to befog rather than clarify.").

## IV.    *Federal Claims - 42 U.S.C. § 1983*

The fourth, fifth, sixth and seventh causes of action of the amended complaint involve alleged violations of the Fourteenth Amendment to the U.S. Constitution pursuant to 42 U.S.C. § 1983. In order to state a claim under § 1983, a plaintiff must allege the defendant (1) deprived him of a federally protected right, and (2) did so "under color of any statute, ordinance, regulation, custom, or usage, of any State or territory." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970). This second element is the requirement that the plaintiff show the defendant acted "under color of law." *Id.*

The Defendants argue that the Plaintiffs did not have a constitutionally protected property interest in the Thatched Cottage at the time of the placarding and therefore all causes of action alleging constitutional deprivations under § 1983 must be dismissed. As a matter of law, the Defendants' assertion is incorrect. A mortgagee has a legally protected property interest in the mortgaged premises for due process purposes, and specifically in the context of § 1983 claims. *See First Nat. Acceptance Co. v. City of Utica, N.Y.*, 26 F. Supp. 3d 185 (N.D.N.Y. 2014); *See also Mennonite Bd. Missions v. Adams*, 462 U.S. 791, 798 (1993) (holding that "[s]ince a

mortgagee clearly has a legally protected property interest, he is entitled to notice… of tax sale");

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). The Defendants' argument

that the Plaintiffs lacks a constitutionally protected property interest warranting the dismissal of

the § 1983 claims is without merit.

Next, the Defendants argue that they are entitled to judgment as a matter of law on the §

1983 claims because the undisputed facts show that any injury to Plaintiffs was not the result of

any "policy or custom" of the Town. In order to hold a municipality liable for constitutional torts

committed by its employees, a plaintiff must establish: (1) that the constitutional violation

resulted from a "policy or custom" of the municipality, *see Monell v. Dep't of Social Services of

New York*, 436 U.S. 658 (1978), and (2) the policy or custom caused the injury, *Bd. Of Cnty.

Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397 (1997). *See also Vippolis v. Village of

Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) (establishing two-prong test). The Court already

addressed the injury element in the standing discussion. This discussion focuses on the "policy or

custom" element.

To establish a municipal policy or custom in this context, a plaintiff must prove one of

the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by the
> government officials responsible for establishing municipal policies related to the
> particular deprivation in question; (3) a practice so consistent and widespread that
> it constitutes a custom or usage sufficient to impute constructive knowledge of the
> practice to policymaking officials; or (4) a failure by policy makers to train or
> supervise subordinates.

*Harris v. City of New York*, 222 F. Supp. 3d 341, 352 (S.D.N.Y. 2016).

The Defendants argue that the decision to placard was only that of Defendant Cline, not

indicative of official policy or custom. They also claim they relied on the Uniform Code, rather

than the Town Code for authority. The Court is not prepared to find the Defendants have established as a matter of law that the decision to placard the Thatched Cottage did not result from a "policy or custom" of the Town under this standard. Based on the record today, the Court cannot discern who made the decision to placard and by what standards. There are many inconsistencies between the facts as revealed in the record and the testimony of the Individual Defendants and other employees of the Town. These inconsistencies leave the Court unable to conclude as a matter of law that the placement of the placard did not result from an official "policy or custom" of the Town.

In addition, relevant to the procedural due process claim based on the Town's failure to give notice to BFCU prior to placarding, it was clearly the Town's policy, per the Town Code, not to give notice to a secured creditor prior to placarding. *See First Nat. Acceptance Co. v. City of Utica,* 26 F. Supp. 3d 185 (N.D.N.Y. 2014) (holding that a substantially similar municipal code, that did not require notice to be given to plaintiff-mortgagee, established an official policy or custom); *see also Town of Orangetown v. Magee,* 665 N.E.2d 1061, 1068 (N.Y. 1996) (holding that the town zoning code "necessarily reflects town policy" for the purposes of establishing § 1983 municipal liability). Because it is Defendant Town's official policy not to provide notice to a mortgagee prior to placarding, the Court cannot, under *Monell*, find in favor of the Defendant on this element of the claim as a matter of law.

The second way to find a "policy or custom" under *Monell* is if the action that caused the violation "was perpetrated by government officials who are responsible for municipal policies related to the particular deprivation in question." *Powe v. Town of Putnam Valley*, No. 08 Civ. 8463(CM), 2010 WL 3958796, at *11 (S.D.N.Y. Sept. 9, 2010). Whether the actor "qualifies as a 'policymaker' … is determined as a matter of state law." *Id.* However, "[m]unicipal liability

27

attaches only where the decisionmaker possesses final authority to establish municipal policy

with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).

The Second Circuit has held that "[a]n official has final authority if his decisions, at the time they

are made, for practical or legal reasons constitute the municipality's final decisions." *Roe v. City

of Waterbury*, 542 F.3d 31, 38 (2d Cir. 2008) (citing *Anthony v. City of New York*, 339 F.3d 129,

139 (2d Cir. 2003)).

Whether Cline was a decisionmaker with final authority to establish municipal policy is a

question of fact that must be reserved for trial. Defendant Cline, in his capacity as Director of the

Department of Engineering Services for the Town, made the decision to placard based on his

own interpretation of the "emergency" nature of the situation based on the Colamussi Reports,

thus creating policy where, Defendants argue, there was none. The Court does not conclude that

Cline was a policymaker, just that the undisputed facts do not show that he was not.

The third way to establish a "policy or custom" sufficient to allow municipal liability

under § 1983 is when the constitutional violation results from "a practice so consistent and

widespread that it constitutes a custom or usage sufficient to impute constructive knowledge of

the practice to policymaking officials." *Harris v. City of New York*, 222 F. Supp. 3d at 352. The

"practice" complained of here is the Defendants' placarding without following proper

procedures. There is sufficient dispute on this issue to deny summary judgment in favor of the

Defendants. Viewed in a light most favorable to Plaintiffs, the facts presented could support a

finding that failing to following proper procedures is a widespread custom for the Town. For

example, Defendant McNally testified that it is sometimes the practice of the Fire Marshal's

Office to placard a building without conducting an inspection first. McNally Dep. Tr., 104, ECF

No. 78-32. Del Col testified that there was "no written policy in place" for assessing threats to

public safety when she was the Director of Engineering Services. Del Col Dep. Tr., 54, dated

April 27, 2017, ECF No. 79-45. Del Col did testify that inspectors would "assess" a potentially

unsafe building, "not necessarily" notify the owners that an inspection was going to occur, and, if

the building was deemed unsafe, the inspectors "might ask that the owner provide an engineering

letter certifying that the structure is safe" or the building inspector "might placard the structure."

*Id.* at 56-58. Defendant Vacchio testified that "the procedure [prior to posting a placard] has been

sketchy at best, but we post, write a report." Vacchio Dep. Tr., 24, June 1, 2017, ECF No. 70-5.

Defendant Vacchio further testified that "the procedure has been to post the building [with a

placard] and eventually get in contact with the owner and written notice of the particulars." *Id.* at

52. Defendant Vacchio also testified that the Defendant Town removes a placard in

circumstances where an owner "brought in certifications saying they [the alleged defects] have

been repaired or we go back and we see the work has been repaired." *Id.* at 26. Defendant

Vacchio further testified that there is not a procedure in place for a property owner to

communicate with the Defendant Town and have a placard removed, but they will remove a

placard after informal communications, and only after the repairs have been made. *Id.* at 27.

Defendant Cline testified that "approximately 70" times a year his department placards

properties on an emergency basis. Cline Dep. Tr., 17, dated Feb. 4, 2016, ECF No. 70-22.

Defendant McNally testified that the Fire Marshall's Office placards properties on an emergency

basis "less than 100" times a year. McNally Dep. Tr., 29, dated April 26, 2017, ECF No. 78-46.

Notably, none of the six employees testified to any personal knowledge of the Town

Code over the course of the eleven depositions between them. In fact, almost all of the practices

described by the Town employees were directly contrary to the Town Code. A reasonable

inference might be drawn from the cited testimony that the practice of disregarding the Town

Code by the employees of the Town was so widespread that it might be found to be the "policy

or custom" of the Town. The Defendants, no doubt, would dispute these facts, or at least the

dispute the inferences to be drawn from the cited testimony. This dispute is yet another basis

upon which to deny summary judgment in Defendants favor.

Plaintiffs have yet another way to prove "policy or custom" in order to establish

municipal liability in the § 1983 context, under the "failure to train" theory. The Plaintiffs allege

that the failure of the Town to train Defendants Cline, Vacchio and McNally on due process

requirements establishes the requisite policy or custom. In order to establish municipal liability

under the "failure to train" theory a plaintiff must show that either the municipality so failed to

train its employees as to display a deliberate indifference to the constitutional rights of its

citizens, or had notice of but repeatedly failed to investigate charges of misconduct by lower-

level employees. *See Newton v. City of New York*, 566 F. Supp. 256, 271-72 (S.D.N.Y. 2008).

There is no allegation here that the Town had notice of charges of misconduct by the Town

employees. Therefore, the only available avenue for the Plaintiffs to assert their "failure to train"

theory is under the "deliberate indifference" standard.

The Second Circuit has established three requirements for a showing of deliberate

indifference in the "failure to train" context:

> First, the plaintiff must allege that a policy-maker knows to a moral
> certainty that her employees will confront a given situation. Second,
> the situation must either present the employee with a difficult choice
> of the sort that training or supervision will make less difficult or that
> there is a history of employees mishandling the situation. Third,
> mishandling of the situation must frequently cause the deprivation
> of a citizen's constitutional rights.

*Id.* at 272 (citations and emphasis omitted).

Based on the testimony of Town employees, cited above, which tends to show that the employees were largely ignorant of, or disregarded, Town procedures for enforcement of Town Code violations, it seems to the Court that a finding could be made that the Town failed to train its employees on proper procedures. Whether this is in fact true and whether the failure to train rises to the level of "deliberate indifference," is an issue which should be tried.

For these reasons, the Court denies the Defendants' motion for summary judgment as to the federal law claims to the extent the Defendants' argue that the constitutional violations were not attributable to municipal "policy or custom." We now turn to the Defendants' motion for summary judgment as to each of the Plaintiffs' § 1983 claims.

### a. *Procedural and substantive due process (4th cause of action)*

The Plaintiffs allege that the act of placarding by the Defendants without providing meaningful notice or a hearing violated procedural due process. The Defendants assert that the procedural due process claim should be summarily dismissed because the Plaintiffs were not entitled to notice, the post-deprivation availability of an Article 78 proceeding satisfied due process, and because the Defendants' actions were at worst negligent, rather than intentional.

The Fourteenth Amendment to the United States Constitution generally requires notice and a hearing before property rights can be altered or terminated, i.e., due process. *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 265 (1981). Procedural due process requires "the government to provide notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Lussenhop v. Clinton County*, 466 F.3d 259 (2d Cir. 2006) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, at 314 (1950)). From this, lower courts "have concluded that an action that severely diminishes the value of mortgaged property entitles the

31

mortgagee to notice and an opportunity to be heard." *First Nat. Acceptance Co. v. City of Utica,* 26 F. Supp. 3d 185 (N.D.N.Y. 2014) (holding that demolition by defendant city "seriously undermined the value of the mortgage that [p]laintiff held on that property" and entitled plaintiff to notice and an opportunity to be heard).

The Defendants argue that state and/or local laws did not require any notice be given to BFCU as secured creditor. Defs.' Br. in Suppl. Of Mot. for Summ. J., 19, ECF No. 83. The Court does not disagree. As outlined above, the Town Code establishes that "written notice" of the determination that a building is dilapidated or that the structure is unsafe for human habitation "shall be served by the code officer upon the property owner, his agent, the occupant(s) or person-in-charge of the property, or any person having a vested or contingent interest in the property as shown on the most current assessment roll maintained by the Town Assessor." Town Code § 124-57. The Town Code clearly does not require notice to mortgagees or other creditors. In *First National*, the court, analyzing a municipal code nearly identical to the one at bar, found that the while municipal code did not require notice to be given to a mortgagee prior to demolition, "failing to provide notice and an opportunity to be heard violated [p]laintiff's procedural due process rights and injured [p]laintiff." *First Nat. Acceptance*, 26 F. Supp. 3d at 197. As in *First National*, the issue presented here is not whether state or local laws were complied with, but rather whether constitutional due process was violated.

However, there are exceptions to the general rule that due process requires "pre-deprivation" notice and a hearing. The Supreme Court has held that when "either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, [is] when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, [this] can satisfy the

32

requirements of due process." *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), *overruled in part by*

*Daniels v. Williams*, 474 U.S. 327 (1986). In addition, the availability of a post-deprivation

procedure such as "an Article 78 proceeding generally satisfies due process if the deprivation is

caused by random, unauthorized state conduct." *Libbey v. Village of Atlantic Beach*, 982 F.

Supp. 2d. 185, 208 (E.D.N.Y. 2013); *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003)

("Where a deprivation at the hands of a government actor is 'random and unauthorized,' hence

rendering it impossible for the government to provide a pre-deprivation hearing, due process

requires only a post-deprivation proceeding.") (citing *Parratt v. Taylor*, 451 U.S. 527, 541

(1981); *Hudson v. Palmer*, 468 U.S. 517, 534 (1984)).

   The Defendants assert that the Court cannot sustain Plaintiffs' procedural due process

claims as a matter of law because the Plaintiffs did not exhaust their "post-deprivation" state law

remedy, i.e., an Article 78 proceeding, before asserting the instant claims. Defs.' Br., 23, ECF

No. 83. However, the Supreme Court has consistently held that "exhaustion of state

administrative remedies is not a prerequisite to an action under § 1983." *Patsy v. Board of*

*Regents of the State of Florida*, 457 U.S. 496, 507 (1982) (affirming that the Supreme Court has

"on numerous occasions rejected the argument that a § 1983 action should be dismissed where

the plaintiff has not exhausted state administrative remedies"). A post-deprivation state law

remedy satisfies due process only when pre-deprivation notice and a hearing is impractical due to

the emergency nature of a situation, or as a result of random, unauthorized conduct. *Ferreira v.*

*Town of East Hampton*, 56 F. Supp. 3d 211, 225 (E.D.N.Y. 2014) (noting that "when the state

conduct in question is random and unauthorized, the state satisfied procedural due process

requirements so long as it provides meaningful post-deprivation remedy. Additionally, in

emergency situations a state may satisfy the requirements of procedural due process merely by

making available some meaningful means by which to assess the propriety of the State's action at some time after the initial taking.") (quotations and citations omitted). The Court cannot find as a matter of law that the existence of a post-deprivation remedy should deprive the Plaintiffs of these procedural due process claims. The emergency nature of the Defendants' placarding of the Thatched Cottage is very much a material fact in dispute, as is whether the acts of the Individual Defendants were random and/or unauthorized.

The amended complaint also alleges violations of Plaintiffs' substantive due process rights. In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate that a valid property interest was deprived by government action and "that the government action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Ahmed v. Town of Oyster Bay*, 7 F. Supp. 3d 245, 256 (E.D.N.Y 2014) (quotations omitted) (citing *Pena v. Deprisco*, 432 F.3d 98 (2d Cir. 2005)). In the Second Circuit, in order to meet this standard, "a plaintiff must show that the government decision it challenges was arbitrary or irrational or motivated by bad faith." *Id*. (quotations omitted) (citing *Rosa R. v. Connelly*, 889 F.2d 435 (2d Cir. 1989)). Actions by the government that are "fairly arbitrary or capricious" are not violative of substantive due process, they must be "outrageously arbitrary." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999).

As this Court has already found that the Plaintiffs had a protectible property interest in the Thatched Cottage at the time of placarding, the Court only analyzes the second element of the substantive due process standard here, i.e., were the Town's actions outrageously arbitrary, irrational or motivated by bad faith. The Plaintiffs assert that there was no legitimate justification for the placarding because the Individual Defendants were aware that the Debtors' catering business was not operational at the time, so there could be no real concern for public safety. The

34

Defendants focus their reply mainly on the post-placarding period and argue that there is no "instance in which Defendants deprived [the Plaintiffs] of a right they were entitled as owners of Thatched Cottage" because the "Defendants granted access promptly on reasonable terms" when requested by the Plaintiffs. Defs.' Mem. of Law, 24, ECF No. 68. However, the conduct alleged to have violated Plaintiffs' substantive due process rights is the maintenance of the placard for over a year without justification not solely whether access was granted or denied. On this point, the Defendants assert that they were "within their legal rights, and arguably required, to maintain the [p]lacard." *Id*. at 31. Any analysis of this issue must necessarily go back to the beginning. That is, if the Town improperly placed the placard, then it would necessarily be improper to maintain it. And so, the Court reverts back to the question, was the placarding of the property by the Town outrageously arbitrary, irrational or motivated by bad faith, and more specifically can the Court make this determination as a matter of law?

In *Cine SK8 v. Town of Henrietta*, 507 F.3d 778 (2d Cir. 2007), the Court held that the defendant Town's "actions were likely sufficiently arbitrary or irrational to preclude granting summary judgment to the Defendants" because the planning dispute at issue was "tainted with fundamental procedural irregularity" and thus "qualifies as arbitrary or irrational." *Cine SK8*, 507 F.3d at 789 (quotations omitted) (*citing Natale*, 170 F.3d. 258). Here, as in *Cine SK8*, this Court finds that "the record demonstrates that there is at least a genuine issue as to whether . . . irregularit[ies] tainted the process" by which the Defendants placarded the Thatched Cottage. The multitude of alleged procedural irregularities (i.e., failing to give notice to anyone with a legal interest in the property, failing to schedule a hearing, relying upon unverified reports, failing to inspect, etc.), and the record in this case suggests that the Defendants may have been motivated more by a desire to address Colamussi's agenda than concern for public safety. This

35

all supports the Court's conclusion that there are material facts in dispute as to whether

Defendants acts were arbitrary or irrational or motivated by bad faith.

For these reasons, the Court will deny the Defendants' motion for summary judgment on

the procedural and substantive due process claim.

### c. Equal Protection (5th cause of action)

The Plaintiffs have also alleged a Fourteenth Amendment equal protection claim. Where

"a plaintiff does not claim to be a member of a constitutionally protected class, he may bring an

Equal Protection claim pursuant to one of two theories: (1) selective enforcement, or (2) 'class of

one.'" *Vaher v. Orangetown*, 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013). The Plaintiffs do not

claim to be a member of a constitutionally protected class, but assert both the selective

enforcement and class of one theories of liability. A selective enforcement claim requires a

plaintiff "show that: (1) he, compared with others similarly situated, was selectively treated, and

(2) the selective treatment was motivated by an intention to discriminate on the basis of

impermissible considerations, such as race or religion, or to punish or inhibit the exercise of

constitutional rights, or by malicious or bad faith intent to injure the plaintiff." *Id*. A "class of

one" claim requires the plaintiff show that: "(1) he was intentionally treated differently from

others similarly situated, and (2) that there was no rational basis for the difference in treatment."

*Id*. The degree of similarity required is higher under the "class of one" theory than under the

"selective enforcement" theory. *See Ruston v. Town Bd. For Town of Skaneateles*, 610 F.3d 55

(2d Cir. 2010) ("Class-of-one plaintiffs must show an extremely high degree of similarity

between themselves and the persons to whom they compare themselves.") (internal citations

omitted). "Generally, whether two entities are similarly situated is a factual issue that should be

submitted to the jury" unless it is clear that no reasonable jury could find the similarly situated

prong met. *Harlen Associates v. Incorporated Village of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001); *Cine Sk8*, 507 F.3d at 790.

The Defendants argue that they are entitled to judgment as a matter of law under either theory because the undisputed facts show that there was no one "similarly situated" in that Defendants "had never before been required to determine whether to placard a building after receiving engineers' reports stating that it was unsafe." Defs.' Mem. of Law, 27, ECF No. 68. The Plaintiffs assert that the fact that the Defendants had never relied upon third-party engineering reports when deciding to placard is evidence that the Defendants treated the Plaintiffs differently than others. The Court finds that the "similarly situated" standard need not be established by proof that the Town had in the past placarded a building based on third party engineering reports – a situation created and defined solely by the Defendants. Defining the class so narrowly virtually ensures that there will be no others similarly situated.

The Defendants also argue that summary judgment on Plaintiffs' equal protection claim is warranted because the Plaintiffs have not established the requisite intent of the Defendants. In this Court's view, issues of intent are not susceptible to resolution on summary judgment. However, even if that were not the case, the record here includes numerous emails, letters, engineering reports and depositions, painting a picture that still is not entirely clear. The inferences to be drawn from the evidence remains very much a triable issue of material fact. The emails between employees of Defendant Town, including those between Walsh and Haber and Walsh and Del Col, are crucial to the fact finding required of this case. At trial, the parties "will have the opportunity to bring into sharper focus certain issues of importance which have been obscured" by the record and the conclusions that are to be drawn from those facts. *Savarin Corp.*, 290 F. Supp. at 290. The Court finds that the Defendants' intent is a disputed issue of

material fact that should be resolved at trial and therefore Defendants' motion for summary

judgment on the equal protection claim will be denied.

### d.   Conspiracy (6th cause of action)

The Plaintiffs have also asserted a conspiracy claim under 42 U.S.C. § 1985(3), arising

from an alleged agreement among the Defendants and Colamussi to impede, hinder or prevent

the sale of the Thatched Cottage by unlawfully placing the placard and thereafter maintaining it

in deprivation of Plaintiffs' rights. "In order to state a conspiracy claim under 42 U.S.C. §

1985(3), a plaintiff must show: (1) a conspiracy; (2) for the purpose of depriving, either directly

or indirectly, any person or class of persons of the equal protection of the laws, or equal

privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4)

whereby a person is either injured in his person or property or deprived of any right or privilege

of a citizen of the United States." *Cine SK8*, 507 F.3d at 791 (citing *Britt v. Garcia*, 475 F.3d

264, 270 n. 4 (2d Cir. 2006)). A conspiracy under § 1985(3) "need not be shown by proof of an

explicit agreement but can be established by showing that the parties have a tacit understanding

to carry out the prohibited conduct." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999)

(internal quotations omitted).

Aside from a standing argument, which the Court addressed earlier in this Decision, the

Defendants also assert that they are entitled to summary judgment because (a) the decision to

maintain the placard on the Thatched Cottage after Plaintiffs acquired it was made by Defendant

Cline in consultation with the Town's legal counsel, not Defendant Vacchio or McNally, and (b)

the Plaintiffs have not established that any Defendant intended to inflict an unconstitutional

injury on anyone. Defs.' Mem. of Law, 30-31, ECF No. 68. This Court has already found that the

issue of the Defendants' intent is very much a material fact in dispute and the Court will not address Defendants' argument regarding intent.

Remaining is the Defendants' argument that Defendant Cline decided to maintain the placard in consultation with the Town's counsel, not Defendants Vacchio and McNally. First, the conspiracy claim relates not only to *maintaining* the placard, but to its placement in the first place. As the Court has already explained, there are factual questions as to how the decision to placard was arrived at which preclude summary judgment. *See, e.g., supra* note 7. The decision to maintain the placard thereafter is only one part of the claim, but the facts are also unclear on that point. Because there are triable issues of material fact regarding the conspiracy claim the Defendants' motion for summary judgment is denied.

### e.  Attorney Fees – 42 U.S.C. § 1988

The Plaintiffs also seeks a judgment for the costs and fees associated with their federal claims. A plaintiff who has prevailed in an action under 42 U.S.C. §§ 1983, 1985 may also seek reasonable attorney's fees under 42 U.S.C. § 1988(b). Because the Court is not dismissing the Plaintiffs' federal claims, the Court will not dismiss the § 1988 claims.

### f.  Are the Individual Defendants entitled to qualified immunity from the federal claims?

The Individual Defendants also argue that the federal claims should be dismissed as to them because they are protected by the doctrine of qualified immunity. "[Q]ualified immunity generally shields government officials from liability for damages on account of their performance of discretionary official functions as long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Ying Jing Gan v. City of New York*, 996 F.2d 522, 531 (2d Cir. 1993) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Summary judgment is "appropriate when the qualified

immunity defense is based on a showing that it was not clear at the time of the official acts that the interests asserted by the plaintiff was protected by federal law" or if "it was objectively reasonable for the official to believe that his acts did not violate those rights." *Ying Jing Gan*, 996 F.2d at 532 (citations omitted).

In the Second Circuit, to determine whether a right is clearly established, a Court considers:

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful.

*Ying Jing Gan*, 996 F.2d at 532 (quoting *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991)).

"Defendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time." *Rosen v. City of New York*, 667 F. Supp. 2d 355, 362 (S.D.N.Y. 2009) (quoting *Varrone v. Bilotti*, 123 F.3d 75, 78 (2d Cir.1997)). Summary judgment is appropriate "[if] the defendant show[s] that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 451 (S.D.N.Y.2012) (alterations in original) (quoting *O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir.2003)). "Dismissal on the basis of a qualified immunity defense is not appropriate, however, where there are facts in dispute that are material to a determination of reasonableness." *Rosen v. City of New York*, 667 F. Supp. 2d 355, 362 (S.D.N.Y. 2009) (citing *Thomas v. Roach*, 165 F.3d 137 (2d Cir. 1999)).

The Individual Defendants assert that they did not violate a "clearly established" right when "placarding the Thatched Cottage based on licensed engineers' reports" and that the

Plaintiffs had no right to a "prior or independent inspection" of the Thatched Cottage before

placarding. Defs.' Mem. of Law, 39, ECF No. 68. The Individual Defendants also claim that

their actions were "objectively reasonable." We take each of the Defendants' assertions in turn.

The Individual Defendants misconstrue the elements necessary to show that a right is or

is not "clearly established." They claim that the Plaintiffs had no right to an independent

inspection prior to placarding and that it was lawful for them to rely upon reports by licensed

engineers because the Town Code did not specifically say they could not placard without notice

and a hearing in the situation presented. They argue that because the specific actions (i.e., relying

on third-party engineering reports, and not conducting their own inspection prior to placarding)

are not specifically unlawful their actions did not implicate a "clearly established" right. While

the Court agrees the Plaintiffs' rights in this context must be reasonably specific, "[t]his is not to

say that an official action is protected by qualified immunity unless the very action in question

has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The

Individual Defendants' argument misses the point. The "clearly established right" at play here

was to have the Town employees adhere to the procedures established by the Town Code, and if

the Defendants believed that an "emergency" existed, i.e., by virtue of the Colamussi Reports,

then to follow the Town Code procedures for emergency circumstances. *See* Town Code § 124-

61. The existence of procedures in the Town Code for emergency situations also addresses the

third factor in the Second Circuit standard for establishing a "clearly established" right, i.e.,

whether under preexisting law a reasonable defendant would have understood that his or her acts

were unlawful. The Town Code establishes procedures for placarding under emergency

circumstances. This includes notice and hearing, and those procedures were clearly ignored.

Thus, the Individual Defendants have not shown that their actions did not violate a "clearly

established" right, and the only remaining avenue available to assert the defense of qualified immunity is by showing that the Individual Defendants' actions were "objectively reasonable."

For reasons already discussed, the Court is not prepared on the record as it exists today to find that the Individual Defendants' actions were "objectively reasonable." The record before this Court is that the Individual Defendants decided to placard an already shuttered business based on unverified engineering reports, that procedures pursuant to the Town Code were not followed because Defendant Cline was "not aware of specifics of the Town Code." Cline Dep. Tr., 50, February 4, 2016, ECF No. 70-22, and that the Defendants maintained the placard for 17-months for reasons not apparent to this Court. Despite the number and length of the depositions taken in this case, the testimony provided does little to establish the reasonableness of the Individual Defendants' actions. For all of these reasons, the Court cannot find at this stage of the proceedings that the Individual Defendants' actions did not violate a "clearly established" right, or that their actions were "objectively reasonable."

### V.   *State Law Claims*

#### a.   *Tortious interference with contract (I$^{st}$ cause of action)*

Under New York law, the elements of tortious interference with contract are: (1) the existence of a valid contract between a plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of a third party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom. *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (other citations omitted). According to the Defendants, in order to prove element #3 – intentional procurement of the breach – Plaintiffs would have to show that procurement of the breach was "solely

malicious." *See Shah v. Town of Islip*, No. 06-34064, 2011 N.Y. Misc. LEXIS 2092, at *21 (Sup.

Ct. N.Y. April 27, 2011).

The Defendants assert that they are entitled to judgment as a matter of law because the

undisputed facts establish that Plaintiffs were not party to any contract with which the

Defendants interfered. The Defendants argue that Plaintiffs were, if anything, merely incidental

beneficiaries of the Raj contract, not in privity, *Alvford & Swift v. Stewart M. Muller Constr. Co.*,

385 N.E.2d 1238 (N.Y. 1978), and not named within the four corners of the alleged contract,

which is not enough to satisfy the first element. Defendants also argue that Plaintiffs' status as

back-up bidder to the Raj contract does not satisfy this element. Defendants further assert that

Plaintiffs have not established each of the Defendants' knowledge of the existence of the Raj

contract. Finally, they argue that the undisputed facts show that they did not intentionally procure

Raj's breach, or if they did, the facts do not show that it was "solely malicious."

In opposition, Plaintiffs argue that their status as third party beneficiary of the Raj

contract, and the Defendants' knowledge of the Raj contract, satisfy the first two elements of the

tortious interference claim. As to the third element of the claim, Plaintiffs argue that there are

material issues of fact in dispute as to whether the Defendants intentionally procured Raj's

breach, and attempts to elicit testimony from Town employees in this regard "met with

resistance." This, Plaintiffs argue, precludes summary judgment in favor of the Defendants.

First, the Court must determine whether the first element of this claim is satisfied. Under

New York law, third-party beneficiaries of a contract may bring a claim for tortious interference

with contract. *See, e.g., Debary v. Harrah's Operating Co., Inc.*, 465 F. Supp. 2d 250, 262

(S.D.N.Y. 2006). A party asserting rights as a third-party beneficiary must establish (1) the

existence of a valid and binding contract between other parties, (2) that the contract was intended

43

for her benefit, and (3) that the benefit to her is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate her if the benefit is lost. *Nanomedicon, LLC v. Research Found. of State Univ. of N.Y.*, 976 N.Y.S.2d 191 (N.Y. App. Div. 2d Dept. 2013). "'In determining third-party beneficiary status it is permissible for the court to look at the surrounding circumstances as well as the agreement . . . Moreover, it is well settled that the obligation to perform to the third party beneficiary need not be expressly stated in the contract.'" *Encore Lake Grove Homeowners Ass'n, Inc. v. Cashin Assoc., P.C.*, 976 N.Y.S.2d 143, 145 (N.Y. App. Div. 2d Dept. 2013).

The Court finds, as a matter of law, that Plaintiffs were third-party beneficiaries of the Raj sale contract. The Raj contract was procured and entered into pursuant to this Court's Order, dated August 11, 2014, approving the sale procedures (the "Sale Procedures Order"). Case No. 14-70001, ECF No. 210. The Raj contract ultimately was approved by the Court pursuant to Order, dated October 16, 2014. Case No. 14-70001, ECF No. 247 (the "Sale Confirmation Order") (together, the "Sale Orders"). As such the Raj contract only existed pursuant to, and must be considered integrated with, the Sale Orders. Pursuant to the Sale Orders, all liens on the real property to be sold, including BFCU's lien, would attach to the proceeds of sale. In addition, BFCU was an integral in negotiating the terms of the Sale Procedures Order. For example, the Sale Confirmation Order approved an agreement between the Chapter 11 Trustee and BFCU, an undersecured creditor, as to the distribution of the sale proceeds and a "carveout" from BFCU's collateral for the bankruptcy estates. Pursuant to the Sale Procedures Order BFCU also agreed to pay auctioneer expenses of sale, not to exceed $25,000. In addition, the Terms and Conditions of Sale, signed by Raj and approved by the Court, specifically gave BFCU rights, along with the Chapter 11 Trustee, to reject any offeror which they believed would not be financially capable of

consummating the purchase. Finally, the Sale Orders embodied the unique nature of the § 363

sale process, bound BFCU as back-up bidder to the terms and conditions of the winning bid, and

required them to step into the deal if the winning bidder defaulted. This bound Plaintiffs to the

Raj contract. Therefore, BFCU, although not a signatory to the Raj contract, was clearly a direct

beneficiary of the proposed sale and an integral party to the sale contract.

As to the second element, the record is clear that the Defendants knew of the existence of

the Raj contract. The record reflects that Town employees had frequent contact with Raj and his

representatives and in fact the Town was introduced to Raj by Hoffman as the "contract vendee."

Diconza Decl. Ex. 24. To the extent that the Defendants maintain their argument that they did

not know of the existence of the Raj contract, the Court finds that is a disputed factual question

which precludes summary judgment.

The Court finds that as to the third element, the intentional or unintended procurement of

Raj's breach, there are material facts in dispute and this Court is not prepared to make this

finding at the summary judgment stage. Although there is no dispute as to the fourth element,

i.e., that Raj breached the sale contract, the Court cannot find at this summary judgment stage

that Plaintiffs were not damaged as a result of the Raj breach.

### b.  *Tortious interference with prospective economic advantage (2nd cause of action)*

Under New York law, to succeed on a claim for tortious interference with prospective

economic advantage, a plaintiff must prove that: (1) plaintiff had a reasonable expectation of

entering into a valid business relationship; (2) defendant knew of that expectation; (3) defendant

purposefully interfered by preventing this expectation from ripening; and (4) plaintiff sustained

damages as a result of defendant's interference. *In re Gormally*, 550 B.R. 27, 41 (Bankr.

S.D.N.Y. 2016). "[A]s a general rule, the defendants' conduct must amount to a crime or an

independent tort." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004). One exception

to this general rule, however, is that a claim for tortious interference with prospective economic

advantage may exist "if lawful means are used but the interference is the infliction of intentional

harm, resulting in damage, and done without excuse or justification." *Sommer v. Kaufman*, 399

N.Y.S.2d 7, 8 (N.Y. App. Div. 1st Dept. 1977).

The amended complaint alleges the Plaintiff had a reasonable expectation of entering

into a valid business relationship, i.e., a contract to sell the real property, and Defendants do not

dispute this element. Defs.' Br., 46, ECF No. 83. Clearly, the Plaintiffs' intention, once they took

title, was to re-sell the property to the highest bidder. However, Defendants argue that the

undisputed facts show that neither the Town nor the Individual Defendants purposefully

interfered with Plaintiffs' expected sale of the property. Even if the placard inhibited a

prospective purchaser Defendants argue that in order to satisfy the third element of the claim a

plaintiff must show that the defendant interfered by "wrongful means" and that must amount to a

crime or an independent tort such as physical violence, fraud or misrepresentation, civil suits and

criminal prosecutions and some degrees of economic pressure. *Carvel Corp. v. Noonan*, 818

N.E.2d at 1104. They argue that their conduct did not rise to this high standard. Moreover, they

argue that the undisputed facts show that they did not prevent the Plaintiffs' expectation of sale

from ripening. In October 2015, Plaintiff signed a contract to sell the real property to Matrix for

$4.1 million, and it was through no fault of the Defendants that that sale failed to close.

Defendants argue that there is no other valid business relationship that Plaintiffs can point to that

failed to ripen due to Defendants' actions.

Plaintiffs' claim here is two-fold: they allege that Defendants' actions interfered with the

Raj sale, and they allege that the continued maintenance of the placard without justification

inhibited with their ability to sell the property going forward by, for example, prohibiting entry into the premises to show the property to prospective purchasers and/or to maintain or repair the premises. Whether this was done purposefully, the Plaintiffs argue, is a material fact in dispute which precludes summary judgment on this cause of action. The Court agrees. Whether the placard was improperly placed at the property, as previously discussed, is a disputed issue of material fact. Whether the maintenance of the placard prevented the Plaintiffs from marketing and selling the property is also a material fact in dispute. The existence of the Matrix offer in October 2015 does not answer the factual question of whether there were other prospective purchasers who may have bid on the property had the placard not inhibited Plaintiffs' marketing efforts or whether the bidding was chilled by the placard. Finally, the Defendants' motive in placarding the property and maintaining the placard is an ultimate issue for trial which will determine whether the Defendants intended to inflict harm on the Plaintiffs and whether their actions were without excuse or justification.

### c. Negligence (3rd cause of action)

To establish a claim for negligence under New York law, a plaintiff must show that: (1) plaintiff was owed a duty of care, (2) defendant breached that duty, (3) and damages resulted as a proximate cause of plaintiff's breach of its duty. *King v. Crossland Sav. Bank*, 111 F.3d 251, 259 (2d Cir. 1997) (citing *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir. 1995); *Solomon v. City of New York*, 489 N.E.2d 1294, 1294-95 (N.Y.1985)). In order to establish negligence against a governmental agency, a plaintiff must show that "'there existed a special duty to the injured person, in contrast to a general duty owed to the public'". *McLean v. City of New York*, 905 N.E.2d 1167, 1171 (N.Y. 2009). This special duty is "'born of a special relationship between

the plaintiff and the governmental entity.'" *Id.* (citing *Pelaez v. Seide*, 810 N.E.2d 393, 399 (N.Y. 2004)); *Valdez v. City of N.Y.,* 960 N.E.2d 356, 365 (N.Y. 2011).

The amended complaint alleges that the Town owed a duty of care to Plaintiffs as a primary intended beneficiary of the Raj contract, to "comply with and uphold laws and regulations and to enforce them fairly and with due care." Amended Complaint, ECF No. 15, ¶ 122. Plaintiffs allege that the Town breached their duty by placing the placard at the property without conducting any independent due diligence or due care, failing to notify anyone prior to affixing the placard, and failing to remove the placard. Plaintiffs allege that the Defendants' negligence in this regard was the proximate cause of Raj's failure to close on the sale in November 2014, which in turn caused damage to Plaintiffs.

The Defendants argue that, as a matter of law, there was no negligence on their part because they had engineering reports showing that the property was not safe for use as a catering hall, and Plaintiffs did not provide an engineering report to the contrary until April 2016. Defendants also argue that Plaintiffs' negligence claim fails because Plaintiffs have failed to establish a "special relationship" between them and the Town.

Under New York law, a "special relationship" between government entity and plaintiff can be created in three ways: (1) when a municipality violates a statutory duty enacted for the benefit of a particular class of persons; (2) when it voluntarily assumes a duty that generates justifiable reliance by the person who benefits from the duty; or (3) when the municipality assumes positive direction and control in the face of a known, blatant and dangerous safety violation. *McClean,* 905 N.E.2d at 1171 (quoting *Palaez*, 810 N.E.2d at 400). The existence of a special relationship is a question of fact. *Applewhite v. Accuhealth, Inc.,* 21 N.Y.3d 420, 431 (N.Y. App. Div. 2d Dept. 2013).

The "special relationship" in this case falls under the first prong set out above, i.e., that there was a statutory duty enacted for the benefit of a particular class. Under this prong, "the governing statute must authorize a private right of action" which need not be express but may be implied where "(1) the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) recognition of a private right of action would promote the legislative purpose of the governing statute; and (3) to do so would be consistent with the legislative scheme." *McLean,* 905 N.E.2d at 1171 (citing *Palaez*, 810 N.E.2d at 400).

Plaintiffs argue that a special relationship was created when the Town violated its duty to comply with, uphold and enforce fairly the provisions of the Town Code. In this case, the notice provisions of the Town Code applicable to the condemnation of property are presumably put in place to comply with due process prior to impacting property rights. This specifically benefits those citizens of the Town holding protectible interests in real property. The allegations are that the Defendants blatantly ignored the Town Code and they did so to the detriment of the Plaintiffs. Until the factual issues surrounding these allegations are resolved, the Court cannot find as a matter of law that no special relationship existed here. *See Garrett v. Holiday Inns, Inc.,* 447 N.E.2d 717, 721-22 (N.Y. 1983) (allowing action against the town and finding "special duty" to plaintiffs – owner and lessee of real property – where the town issued false certificates of occupancy and misrepresented that there were no violations at the property). Whether the Defendants were in fact negligent also presents an issue of fact which cannot be resolved on summary judgment.

    **d.  Are the Individual Defendants entitled to absolute immunity from the state law claims?**

The Individual Defendants argue that they are entitled to absolute immunity from the state law claims because their actions in placarding the property were discretionary in nature. *See Tango v. Tulevech*, 459 N.E.2d 182, 185 (N.Y. 1983) (discretionary acts of municipal employees are entitled to absolute immunity); *Shah v. Town of Islip*, No. 06-34064, 2011 N.Y. Misc. LEXIS 2092 **12-13 (Sup. Ct. April 27, 2011); *Walls v. Town of Islip*, 894 N.Y.S.2d 899 (N.Y. App. Div. 2d Dept 2010); *Valdez v. City of N.Y.*, 960 N.E.2d 356, 361-62 (N.Y. 2011); *Massa v. City of Kingston*, 652 N.Y.S.2d 857, 859 (N.Y. App. Div. 3d Dept. 1997). This is true, they argue, even if the employees acted with malice or bad faith. *See Tango*, 459 N.E.2d at 185; *Hi Pockets, Inc.*, 192 F. Supp. 2d 143, 155 (S.D.N.Y. 2002) (finding immunity applies even to those actions done with malice).

In New York, "a public employee's discretionary actions – meaning conduct involving the exercise of reasoned judgment – may not result in the municipality's liability even when the conduct is negligent." *Valdez v. City of N.Y.*, 960 N.E.2d at 362 (citing *Lauer v. City of N.Y.*, 733 N.E.2d 184, 187 (N.Y. 2000)); *DePietro v. City of N.Y.*, No. 09-CV-932, 2010 U.S. Dist. LEXIS 8598 (E.D.N.Y. Jan. 29, 2010) (noting that absolute immunity only applies to those discretionary acts that are considered judicial in nature). This defense does not attach unless the "municipal defendant establishes that the discretion possessed by its employees was in fact exercised in relation to the conduct on which liability is predicated . . ." *Valdez v. City of N.Y.*, 960 N.E.2d at 362 (citing *Haddock v. New York*, 553 N.E.2d 987, 990-91 (N.Y. 1990)). Merely ministerial acts of employees, on the other hand, are not entitled to absolute immunity. *Id*.

Plaintiffs argue that whether the Individual Defendants' actions were discretionary is a question of fact that must be determined at trial. While the decision to placard a property may be discretionary, Plaintiffs argue that that discretion only comes into play after proper inspection

and notice procedures are followed. The Court agrees. The cases relied on by the Defendants pre-suppose that the municipal employee followed town code and procedures before exercising their discretion and taking action against the plaintiff.[12] While this Court agrees that there is good public policy reason for granting absolute immunity to municipal employees acting within the scope of their authority and according to established procedures, that policy does not extend to employees' actions which are contrary to established procedures.

In the case at bar, whether the Individual Defendants followed proper procedure is a material fact in dispute. As such, the Court declines to grant absolute immunity from the state law claims at this stage of the proceedings.

## CONCLUSION

In conclusion the Court notes that both parties focus much of their argument on the content of the various engineering reports. The Plaintiffs argue that the Thatched Cottage was structurally sound, the Colamussi Reports that stated otherwise were unfounded, and the Defendants' reliance on such reports was unjustified. The Plaintiffs argue, at length, that the Tauscher Reports somehow show the Defendants' intentional misconduct, i.e., that the Defendants had engineering reports in hand that contradicted the findings of the Colamussi Reports and ignored them. Conversely, the Defendants allege that no report has shown that the

---

[12]    For example, in *Shah v. Town of Islip*, the court upheld absolute immunity for town employees who placarded a building. However, the facts of that case show that the deteriorated condition of the subject property was well-documented by engineering reports *and* building department inspections, and citations were issued and notice given to the owner. And in *Tango v. Tulevech*, 459 N.E.2d 182 (N.Y. 1983), plaintiff brought a negligence claim against a county employee for wrongfully depriving plaintiff of custody of his two children. The Court of Appeals upheld absolute immunity in that case because, even if the employee's determination was ultimately incorrect, the employee exercised her discretion after: conferring with the parents and children, inspecting documents presented, examining the children for signs of abuse, i.e., following proper procedure.

Thatched Cottage is safe, not even the Pacifico Report.[13] Therefore, the Defendants were justified in placarding the Thatched Cottage, and cannot be held liable.

However, the substance and veracity of any of the reports alone neither vindicates the Defendants nor establishes liability for the Plaintiffs at this stage of the proceedings. There are material facts in this case that call into question the Defendants' motive and intent in placing the placard at the Thatched Cottage. For example, the Defendant Town had inspected the premises and issued an assembly and occupancy permit for the Thatched Cottage just three months prior to determining the premises was so unsafe placarding was warranted without notice or an opportunity to remediate. Consider this alongside the fact that Colamussi at the time was engaged in a campaign to thwart potential bidding at the property, and the email chain among Town employees suggesting that Colamussi wanted them to "do something" about Thatched Cottage and the Town was "taking care of it," and the Town's motive and intent becomes even less clear. And then, the Defendant Town removed the placard two years later even though no repairs had been made to the Thatched Cottage. Based on statements by Town employees, the decision to placard the property without following procedures set out in the Town Code was haphazard at best. The facts of this case as presented in the motion for summary judgment cry out for a trial on the merits where the credibility of witnesses can be weighed by the trier of fact. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

---

[13]     The Defendants assert that "[t]here is no evidence anywhere that Thatched Cottage is, or was in November 2014, safe for use as a catering hall." Defs.' Br., 47, ECF No. 83.

For all of these reasons, the Defendants' motion for summary judgment is denied. An order consistent with this Decision will enter forthwith.



Dated: Central Islip, New York
     March 21, 2019

                                     **Robert E. Grossman**
                           **United States Bankruptcy Judge**